Brian S. King, #4610
Samuel M. Hall, #16066
Andrew D. Miller, #19625
Haley K. Kendall, #20634
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
samuel@briansking.com
andy@briansking.com
haley@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN W. and Z.W.,<br><br>Plaintiffs,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, BAUSCH HEALTH US, LLC, THE BAUSCH HEALTH US, LLC MEDICAL BENEFITS PLAN,<br><br>Defendants. | COMPLAINT |

Plaintiffs Jonathan W. ("Jonathan") and Z.W., through their undersigned counsel, complain and allege against Defendants Aetna Life Insurance Company ("Aetna"), Bausch Health US, LLC ("the Plan Administrator"), and the Bausch Health, US, LLC Medical Benefits Plan ("the Plan") as follows:

//

**PARTIES, JURISDICTION AND VENUE**

1. Jonathan and Z.W. are natural persons residing in Montgomery County, Pennsylvania. Jonathan is Z.W.'s father.
2. Aetna is an insurance company headquartered in Hartford County, Connecticut and was the third-party claims administrator, as well as the fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA"), for the employee welfare benefits plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.
3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.* Jonathan was a participant in the Plan and Z.W. was a beneficiary of the Plan at all relevant times. Jonathan and Z.W. continue to be participants and beneficiaries of the Plan.
4. Plan participants and beneficiaries were told that Aetna was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.
5. At all relevant times, Aetna acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.
6. The Plan Administrator is the designated administrator for the Plan.
7. Z.W. received medical care and treatment at New Haven RTC ("New Haven") from July 8, 2024, to May 29, 2025. New Haven is a licensed treatment facility located in Utah

County, Utah, which provide subacute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

8. Aetna denied claims for payment of Z.W.'s medical expenses in connection with her treatment at New Haven.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Aetna does business in Utah, and the treatment at issue took place in Utah.

11. In addition, the Plaintiffs have been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely both his and Z.W.'s privacy will be preserved.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents to produce within 30 days documents under which the Plan was established or operated, an award of

prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Z.W.'s Developmental History and Medical Background

13. Z.W. was born in 2008.

14. In 2019 at age eleven, Z.W. began drinking alcohol, unbeknownst to her parents.

15. In 2021 at age fourteen as a Freshman in High School, Z.W. began vaping marijuana and nicotine daily. When confronted by her mother about it, Z.W. said that she wouldn't stop vaping.

16. In 2022, Z.W. experimented with hallucinogenic mushrooms, acid, oxycodone, Xanax and cocaine.

17. She was sexually assaulted by different offenders on three occasions: in 2018, 2021, and 2022.

18. In 2022, Z.W.'s trauma was compounded by the death of a friend who had been run over by a truck while out on his bicycle.

19. In January 2023, Z.W. said she was depressed. She started online therapy and was prescribed Zoloft, and then Lexapro.

20. In March 2023, she suffered a knee injury and as a result no longer wished to play soccer. On the way to her physical therapist appointment, she became dysregulated and had a bloody nose in the car. Jonathan and Z.W. turned around and went home, where she passed out.

21. For the first time in her life, Z.W. was hospitalized due to experiencing thoughts of suicide.

22. She was admitted to Reading Health for about five days.
23. She was then admitted to The Light Program's Partial Hospitalization Program (PHP) in Phoenixville, Pennsylvania.
24. In August 2023, while in treatment, she learned that a boy she was dating was seeing someone else, and she became extremely dysregulated.
25. In October 2023, Z.W. was taken to the emergency room on October 4, 2023, for a second time for self-harm, which her parents believed may have been a suicide attempt.
26. Z.W.'s parents began exploring other schools for Z.W. to attend because she was eating lunch in the bathroom at school. When Jonathan and Z.W. went to visit a school, on the way home she had a meltdown in the car. When they got home, she cut herself very badly in her room. Jonathan took her to the Emergency Department.
27. From October 5 through October 17, 2023, Z.W. was admitted to Kids Peace, a Psychiatric Inpatient Care Facility.
28. On October 17, 2023, she began attending the PHP at Center for Families.
29. On November 19, 2023, Z.W.'s parents found a knife in her bedroom.
30. At the instigation of Samantha Eldredge, LCSW, and Erin Gautier, PMHNP recommending that Z.W. needed a higher level of care, Z.W. was admitted on November 22, 2023, to Newport Academy, a residential program in Oakley, Utah. She was discharged on January 19, 2024.
31. The first few weeks back home, Z.W. benefited from treatment in that she was able to abstain from drug abuse but then relapsed. She also stopped taking her medications.
32. On April 3, 2024, Z.W. overdosed on Ambien and Xanax in what might have been a suicide attempt and was transported via ambulance to Phoenixville Hospital.

33. On one occasion, in April 2024, Z.W. was in a manic state and was hitting her head against the floor. Jonathan had to hold her until she calmed down.

34. From April 5, 2024, through April 11, 2024, she was hospitalized at the CHOP Center for Advanced Behavioral healthcare in Philadelphia, Pennsylvania.

35. On April 15, 2024, she enrolled in the Intensive Outpatient Program (IOP) at the Center for Families.

36. On May 16, 2024, with no viable in-network options in Jonathan's home state of Pennsylvania, Z.W. was admitted to 3 Peaks Ascent Wilderness (3 Peaks) in Enterprise, Utah. Although the program helped her by her own admission with sobriety, she did not make friends with the other girls.

37. After her treatment program at 3 Peaks ended on July 8, 2024, clinicians for 3 Peaks, Danielle Schneider, LMFT, Todd Corelli, PhD, and educational consultant Mike Balotti, all recommended that Z.W. be admitted for continued care to another specialized residential treatment program meeting her complex needs.

**New Haven**

38. On July 8, 2024, Z.W. was admitted to New Haven in Spanish Fork, Utah.

39. Aetna authorized coverage at New Haven for the first few weeks of treatment via four approval letters dated July 18, July 23, August 7, and August 14, 2024. All four approval letters stated that they relied on several guidelines, including CALOCUS-CASII and ASAM. However, the first approval letter, valid for fifteen days, differed from the latter three in that it stated that Aetna approved the service at a *network* benefit level whereas the latter three stated that they approved the service at an *out-of-network* benefit level:

//

| July 18, 2024, Approval letter | July 23, August 7, and August 14, 2024, Approval letters |
| --- | --- |
| This service is approved at an **in-network benefit level.** The member will be responsible only for in-network cost-sharing requirements. The provider identified to provide this service doesn't participate with this plan. If the member receives services from this provider that aren't identified and approved in this letter, the member may be responsible for out-of-network cost-sharing requirements and for any difference between the provider's charge and the amount the plan covers. | This service is approved at an **out-of-network benefit level.** The provider identified to provide this service does not participate with this plan. The member will be responsible for out-of-network cost-sharing requirements and for any difference between the provider's charge and the amount the plan covers. [emphases added] |

41. On August 23, 2024, Aetna's medical director Olga Rafaelian, MD, issued a denial letter for "service dates 08/20/2024" [sic] stating in relevant part:

> We use nationally recognized clinical guidelines and resources, such as…American Society of Addiction Medicine Criteria: Treatment for Addictive, Substance-Related, and Co-Occurring Conditions (ASAM Third Edition).
>
> Based on CALOCUS-CASII criteria and all the information made available to us, we're denying coverage for an RTC level of care. This level of care isn't medically necessary under the terms of your plan. The plan requirement for coverage is a CALOCUS-CASII score between 23-27, achieved when all of the following are met: (1) a significant risk to harm yourself or others; (2) a moderate inability to function; (3) a significant medical or substance use problem, or a developmental disability that is either made worse by or worsens your current condition; (4) a highly stressful environment with minimal support; (5) inability to deal with stressors; and (6) limited engagement with available treatment and services, or lack of age appropriate responsibility for your treatment. You don't meet all of the requirements. Care can be provided with less intense treatment.

42. Despite Z.W.'s cannabis and nicotine addiction diagnoses and her "High Probability of a Severe Substance Use Disorder" according to Dr. Corelli's Substance Abuse Subtle Screening Inventory test, Aetna's reviewer Dr. Rafaelian lacked any certification in addiction medicine, rendering her unfit to evaluate Z.W. according to ASAM, one of the very guidelines Aetna purportedly relied upon:

> Physicians who review appeals of denials of authorization for coverage and payment for addiction care should be certified as addiction physician specialists or subspecialists.[1]

43. Moreover, Dr. Rafaelian is not a Child and Adolescent Psychiatrist, rendering her further unfit to evaluate Z.W. according not only to the American Association of Child and Adolescent Psychiatry (AACAP) explicitly,[2] but also implicitly according to AACAP's CALOCUS-CASII criteria, the very guidelines Aetna based its decision on:

> [W]hile this document [CALOCUS-CASII] does not specify requirements for the levels of clinician training, **clinicians should be well trained**, with applicable licensure and/or certification (e.g., **child and adolescent psychiatrists**, pediatricians, family doctors, <u>child and adolescent</u> psychologists, marriage and family therapists, clinical social workers, professional counselors, psychosocial nurses, independent nurse practitioners, substance abuse clinicians, and/or pastoral counselors), **and with training specifically in child, adolescent, and family treatment**. Clinicians should provide only care that is within their scope of practice. [emphases added]

44. The CALOCUS-CASII criteria evaluate what level of care is appropriate by assigning scores and sub-scores across various metrics.

45. Aetna withheld any details as to what CALOCUS-CASII composite score and sub-scores it had assigned Z.W. or what evidence in the medical records it had used to determine that Z.W. no longer qualified for an RTC level of care.

---

[1] Third-Party Payment for Addiction Treatment – ASAM Public Policy Statement: https://www.asam.org/docs/default-source/public-policy-statements/2020-statement-on-third-party-payment-for-addiction-treatment4824349472bc604ca5b7ff000030b21a.pdf?sfvrsn=cf9854c2_2

[2] "When the utilization management organization requires the direct input of the attending psychiatrist, the reviewer will be a board certified child and adolescent psychiatrist. The utilization management professional staff should have training, continuing education and ongoing experience in the specialty field under review and with the treatment setting being reviewed. Specifically, child and adolescent patients in psychiatric inpatient treatment should be reviewed by board certified child and adolescent psychiatrists with psychiatric hospital experience." - AACAP: "Issues in Utilization Management": https://www.aacap.org/aacap/Policy_Statements/1990/Issues_in_Utilization_Management.aspx

46. In response to Aetna's previous statement that Z.W.'s treatment from September 1, 2024, through September 14, 2024, had been processed as "an interim charge" and would be completely processed once Aetna had received the completed claims for Z.W.'s full treatment at New Haven, Jonathan attached the remaining claims to his appeal and asked the next reviewer to process them appropriately.

47. He stated that Aetna had never issued any kind of response to Z.W.'s claims from February 6, 2025, to May 29, 2025, and asked the next reviewer to include these dates of service in their review.

48. On January 21, 2025, Aetna issued two letters, an approval letter and a denial letter.

49. In its approval letter, Aetna wrote that in response to Jonathan's appeal it was reversing its previous decision and would allow reimbursement for Z.W.'s dates of service at New Haven from July 23, 2024, to July 31, 2024. Aetna stated that the reason for this reversal was "because there is an approved authorization on file for dates July 23, 2024 – August 07, 2024."

50. Aetna did not elaborate on why it only approved a week's worth of treatment when its own assessment authorized care through August 7, 2024.

51. In its other letter dated January 21, 2025, Aetna upheld its adverse benefits determination for dates of service August 20, 2024, through August 31, 2024. The insurer wrote in pertinent part:

> What we reviewed
> We are responding to the appeal of our decision on the following issue:
> - Inpatient care
> - Total billed amount: $18.780.00
> - Claim action code: 415-This is not covered. Based on what we received, the services were not provided. If you want us to reconsider, send us more information.

> - Claim action code: ON6-You may pay less by using providers that are in your plan's network. Find them by calling us or by logging into your secure member website.
> - Claim action code: NP3-This is an interim charge. When you provider sends us the complete bill for your stay, we'll apply your plan's benefits. Your responsibility for the whole stay will show on that explanation of benefits
>
> We reviewed all available information, including:
> - The precertification request file
> - The Child Adolescent Level of Care Utilization System for Psychiatric and Addictive Services (CALOCUS): LEVEL FIVE: Medically Monitored Intensive Integrated Services Non-Secure, 24 hour Service with Psychiatric Monitoring
> - Aetna Clinical Policy Bulletin (CPB) number 0388 Complementary and Alternative Medicine, Last reviewed June 14, 2024
>
> As of August 19, 2024, the member was generally complying with rules on the unit, and was not acutely suicidal, homicidal or psychotic. The member was medically stable and behaviorally in control. She was not violent or aggressive and was caring for activities of daily living adequately. There is no indication that the member had psychiatric symptoms that required 24/7 monitoring or would prevent her from being effectively treated in a less restrictive setting. Therefore, the denial is upheld.
>
> There is no additional information exchanged that supported the need for mental health residential treatment. Treatment could be delivered safely and effectively in a less restrictive setting. Denial is upheld as calocus [sic] criteria supports [sic] mental health intensive outpatient treatment as the medically necessary level of care.

52. The letter stated that an unnamed MD, "board-certified in xxxxxxxx [sic]," participated in the review of the appeal.

53. On June 9, 2025, Jonathan submitted a Level One Member Appeal for dates of services from July 8, 2024, through May 29, 2025.

54. He included a chart showing all the claims he had made, their corresponding dates of service, and Aetna's respective denial reasons ranging from "Denial for Medical Necessity," "Denied for Services Not Provided," "Never Processed" to "Denial for Information Needed."

55. Although Z.W.'s treatment at New Haven was authorized August 7, 2024, through August 10, 2024, he pointed out that he had not yet been paid by Aetna. He asked the new reviewer to correct this mistake.

56. Pursuant to ERISA, Jonathan requested that the next reviewer(s) be appropriately qualified, which in his case meant a board-certified child and adolescent psychiatrist with experience treating adolescents with substance abuse and Z.W.'s set of conditions, including executive function deficits.

57. Jonathan wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

58. Jonathan wrote that Aetna's response to his Level One Member Appeal failed to specify Z.W.'s CALOCUS-CASII composite score and sub-scores. He reiterated his request for this information, as well as the clinical rationale detailing how each reviewer arrived at these scores, including clinical information used in the process.

59. He expressed concern that Aetna was hedging its bets by shifting its denial rationales from an initial lack of medical necessity to a lack of information or services not matching what is billed. By doing so and not acting in his best interest, Jonathan wrote that Aetna was violating his rights under ERISA.

60. Jonathan expressed further concern that the denial of payment for Z.W.'s treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that

benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification.

61. Jonathan identified skilled nursing facilities, subacute rehabilitation services, inpatient habilitative services, and inpatient hospice services as some of the medical or surgical analogues to the treatment Z.W. received.

62. He wrote that statements in Aetna's denial letter such as Z.W. was "not acutely suicidal, homicidal or psychotic" evidenced that Aetna had intentionally misapplied the CALOCUS-CASII guidelines by imposing acute severity of illness requirements on subacute or intermediate behavioral health treatment.

63. By contrast, John wrote that he was unable to find any indication that Aetna required patients to exhibit acute medical symptoms to qualify for treatment in an intermediate medical facility. Moreover, he stated that criteria for skilled nursing facilities in the Medicare Benefit Policy Manual proved that acute severity of illness requirements are inconsistent with generally accepted standards of medical practice for intermediate facilities.

64. Therefore, he asserted, these acute severity of illness requirements imposed a Non-Quantitative Treatment Limitation (NQTL) on intermediate behavioral health benefits that Aetna does not apply to comparable intermediate medical benefits and that this violated MHPAEA.

65. Jonathan asserted that Aetna was obligated per ERISA to engage in a meaningful dialogue regarding his concerns.

66. He requested that review of his appeal include conducting a comparative parity analysis to determine whether the Plan is truly being administered in compliance with MHPAEA.

67. Specifically, Jonathan asked the Plan Administrator to provide him with details regarding: (1) the specific plan language regarding the treatment limitation on with the denial was based and identify all of the medical/surgical and mental health and substance use disorder benefits to which it applies (or does not apply) in the relevant benefit classification; (2) the factors used in the development of the limitation; (3) the evidentiary standards used to evaluate the factors; (4) the methods and analysis used in the development of the limitation; and (5) any evidence and documentation to establish that the limitation is applied no more stringently, as written and in operation, to mental health and substance use disorder benefits than to medical and surgical benefits.

68. Jonathan raised the issue of the inconsistency and incorrectness with which Z.W.'s claims were processed from July 8, 2024, to August 19, 2024, involving the varying allowed amounts and related maximum allowed amounts. He singled out one of the dates of service in which one of the claims was paid at 33.3% and called attention to the fact that this rate was significantly lower as a percentage of billed charges that payment rates from Aetna for other dates of Z.W.'s treatment.

69. He quoted the Plan's definition of "Recognized Charge" and stated that the ambiguity in the Plan language made it unclear how Aetna calculated the recognized charges. Jonathan also asked whether "a claim specific rate or discount" was negotiated by Aetna or a third-party vendor.

70. He argued that all of Z.W.'s claims should have been paid at the very least at 89.6%, the rate at which Aetna had paid for one of the dates of service.

71. Jonathan asked to be provided with clear and detailed documentation describing the exact methodology used to calculate the allowed amount for each of his claims. He added that

even if Aetna believed such information was considered proprietary, he has the right under ERISA to receive any "procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit."

72. In response to Aetna's disparate denial rationales for covering Z.W.'s treatment at New Haven, Jonathan included in his appeal the medical records, a letter of medical necessity, several confirmation of care letters, Dr. Corelli's psychological assessment report, the 2022 CALOCUS-CASII guidelines, a timeline of Z.W.'s conditions and treatment history, and the Plan's definition of medical necessity.

73. The documents proved, he argued, that the services were rendered as billed, and that every day of Z.W.'s residential treatment was medically necessary.

74. By way of illustration, Destiny Garcia, Psychiatric Mental Health Nurse Practitioner (PMHNP) at New Haven, wrote this letter of medical necessity on April 10, 2025:

> At the time of continued residential treatment (post-August 19), [Z.W.] was still at significant clinical risk. While she may have appeared medically stable, psychiatric stability requires more than the absence of aggression or suicidality. In fact, just prior to this appeal window, [Z.W.] experienced a significant self-harming event involving self-mutilation, indicating a clear, active psychiatric need and emotional dysregulation that warranted ongoing 24/7 supervision and therapeutic containment.
>
> Aetna's denial suggests she no longer required 24-hour care, but this overlooks several critical clinical factors:
>
> Dual Diagnosis Complexity: [Z.W.]'s co-occurring substance use, trauma history, and mood instability require integrated, intensive interventions that cannot be safely or effectively delivered in an outpatient setting.
>
> Functional Impairment: Despite being behaviorally compliant, [Z.W.] demonstrated ongoing emotional volatility, dysregulation, and impaired executive functioning, impacting her ability to process emotions safely outside of a structured therapeutic environment.
>
> Continued Clinical Progress Was Dependent on 24/7 Support: [Z.W.] remained actively engaged in weekly individual therapy, family therapy, daily therapeutic groups, relapse prevention planning, trauma processing, and psychiatric oversight. Her progress relied on the therapeutic milieu and staff support systems to reduce relapse and self-harming behavior.

> CALOCUS Level of Care Justification: [Z.W.] clearly met CALOCUS Level 5: Medically Monitored Intensive Integrated Services, which includes non-secure 24-hour psychiatric monitoring—especially appropriate for teens with ongoing safety concerns and active substance use recovery needs.
> Risk of Premature Step-Down: transitioning [Z.W.] prematurely to a lower level of care—especially after a recent significant self-harm episode—would likely have resulted in regression, increased risk of relapse, and potentially escalated psychiatric crises.

75. In addition, Jonathan asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

76. On June 23, 2025, Aetna upheld the adverse benefit determination and provided this justification:

> Claim E4PDDTQW700 was paid correct [sic] at the out-of-network rate. The authorization was approved but New Haven Residential Treatment Center was not approved at the in-network rate.
>
> Claims EFY2HWWVY00, EPDF75ND00, EBFDH6F1600, and EAADH2NB000 with DOS ranginf [sic] from September 22, 2024 through October 12, 2024 were denied for needing to be reviewed. Apon [sic] review, information was requested from the provider. To date, we have not received the requested information. Upon receipt of the requested information, we will conclude our review.
>
> This denial of coverage is based solely upon the reasons set forth above. No other basis for exclusion (e.g., medical necessity of the service or supply) that may be applicable to the circumstances was evaluated at this time.

77. As to the issue of "Recognized charge," Aetna wrote in pertinent part:

> Voluntary Services

> The amount of an out-of-network provider's charge that is eligible for coverage. You may be responsible for all amounts above what is eligible for coverage. However, there are some types of claims for which a provider may not bill you for amounts above what is eligible for coverage (…).
> If your claim is not paid as outlined above, the recognized charge for specific services or supplies will be the out-of-network plan rate, calculated in accordance with the following:

| Service or Supply | Out-of-Network Plan Rate |
|---|---|
| Professional services* | 175% of the Medicare allowed rate |
| Inpatient and outpatient charges of hospitals* | 175% of the Medicare allowed rate |
| Inpatient and outpatient charges of facilities other than hospitals* | 175% of the Medicare allowed rate |

> Important note: If the provider bills less than the amount calculated using the out-of-network plan rate described above, the recognized charge is what the provider bills.
>
> Our reimbursement policies
> We have the right to apply our reimbursement policies to all out-of-network services including involuntary services. This may affect the recognized charge. When we do this, we consider:
>
> - The length and difficulty of a service
> - Whether additional expenses are needed, when multiple procedures are billed at the same time
> - Whether other conditions change or make a service unique

78. Of note, Aetna stated that "[t]he length and difficulty of a service" was a factor in its reimbursement policy while maintaining that Aetna complied with generally accepted standards of care. Concurrently, the June 23, 2024, denial letter reiterated that Aetna "use[s] nationally recognized clinical guidelines and resources, such as…ASAM."

79. ASAM, whose authoritative opinion was germane to Z.W.'s addiction diagnoses, condemned Aetna's policy of using length of service as a criterion for coverage:

> The nature of addiction as a chronic disease should be respected by the utilization management process such that both psychosocial and medication treatment for

> addiction are covered without medical necessity assertions that arbitrarily impose limitations on the intensity and/or duration of care.[3]

80. On August 12, 2025, Jonathan submitted a Level Two Member Appeal.

81. He stated that Aetna deprived him of a full, fair, and thorough review, which was his right under ERISA, by failing to consider all dates of service from July 9, 2024, to Z.W.'s discharge on May 29, 2025. Instead, Aetna's denial letter arbitrarily cut off dates of service after October 12, 2024. He asked Aetna to review *all* of Z.W.'s treatment dates when processing his appeal.

82. Jonathan upbraided Aetna for failing to provide him with an NQTL parity analysis as he had requested.

83. He noted Aetna's failure to respond to or even acknowledge the arguments he had made in his previous appeal and argued that this deprived him of the meaningful dialogue he is entitled to under ERISA.

84. As to Aetna's statement that one of Z.W.'s claims "was paid correct [sic] at the out-of-network rate," Jonathan countered that Z.W.'s authorized dates from July 8, 2024, through August 10, 2024, were never paid.

85. He also took issue with Aetna's assertion that these were authorized/allowed at the correct out-of-network rates. Jonathan pointed out that the Plan contained different methodologies for how out-of-network services were calculated for allowed amounts, but none of them explained the inconsistencies between Z.W.'s individual authorized claims.

---

[3] "Third-Party Payment for Addiction Treatment," ASAM Public Policy Statement: https://www.asam.org/docs/default-source/advocacy/2020-statement-on-third-party-payment-for-addiction-treatment.pdf?sfvrsn=ee1654c2_2

86. As to Aetna's assertion that it had never received complete claims with respect to other claims Jonathan had submitted and that Aetna had not approved authorizations on file for the dates of service, Jonathan maintained that he had included the complete claims in his previous Level One Member appeal. He also stated that the corresponding claims had been misclassified as "interim claims" and that Aetna had begun denying Z.W.'s treatment on August 20, 2024. Therefore, Aetna would be expected to automatically deny authorization, which amounted, Jonathan argued, to a mishandling of Z.W.'s claims.
87. Jonathan was also very concerned that Aetna's June 23, 2025, denial letter did *not* mention Z.W.'s medical records among the pieces of information Aetna had considered in their review besides the Claim History, his appeal request, and the Summary Plan Description.
88. He stressed that Aetna's apparent failure to engage with the medical records discredited one of the denial reasons that applied to four of Z.W.'s claims, to wit: Aetna stating that it needed more information. He asked the next reviewer to fully examine all of the medical records he had previously provided.
89. Jonathan responded to Aetna's statement in its June 23, 2025, denial letter that lack of medical necessity wasn't the basis for any of its denials. He stated that this was false because Aetna had previously stated in its January 21, 2025, denial letter that Z.W.'s treatment from August 20, 2024, through August 31, 2024, wasn't medically necessity.
90. He requested that the next reviewer take their responsibilities seriously and consider all of the evidence he had provided for dates of service from July 8, 2024, to May 29, 2025.
91. Aetna failed to respond to Jonathan's Level Two Member Appeal within the required thirty-day window as per the Plan, nor did he receive a letter at any subsequent time.

92. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA to the degree they were able given Aetna's failure to respond to Jonathan's level two appeal.

93. The denial of benefits for Z.W.'s treatment was a breach of contract and caused Jonathan to incur medical expenses that should have been paid by the Plan in an amount totaling over $550,000.

94. Aetna failed to produce any parity analysis or copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite Jonathan's request.

95. After Aetna repeatedly failed to produce the requested documents. Jonathan made one last attempt by sending a letter dated November 21, 2025 directly to the Plan Administrator, with a copy to Aetna. In particular, Jonathan asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my child, [Z.W.], at New Haven, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [Z.W.]'s claim;
- A complete copy of both the medical necessity criteria utilized by Aetna in determining that [Z.W.]'s treatment was not medically necessary and that treatment for [Z.W.] at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, subacute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and Aetna have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by Aetna and Bausch Health US, LLC in connection with [Z.W.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;

- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [Z.W.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and Aetna; and
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

96. Aetna and the Plan Administrator failed to respond and did not comply with Jonathan's request for documents.

**<u>FIRST CAUSE OF ACTION</u>**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Against Aetna and the Plan)**

97. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Aetna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

98. Aetna and the Plan failed to provide coverage for Z.W.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

99. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

100. The denial letters produced by Aetna do little to elucidate whether Aetna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them

with the "full and fair review" to which they are entitled.

101. Aetna failed to substantively respond to the issues presented in Jonathan's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

102. In fact, despite its legal and contractual obligation to do so, Aetna failed to respond to Jonathan's level two appeal at all.

103. Aetna and the agents of the Plan breached their fiduciary duties to Z.W. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Z.W.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Z.W.'s claims.

104. The actions of Aetna and the Plan in failing to provide coverage for Z.W.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

105. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

//

//

//

//

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3) Against Aetna and the Plan)**

106. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both statutes. The obligation to comply with both ERISA and MHPAEA is part of Aetna's fiduciary duties.

107. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

108. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

109. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

110. The application of the medical necessity criteria used by Aetna for the intermediate level mental health treatment benefits at issue in this case are more stringent

or restrictive than the application of the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

111. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Z.W.'s treatment include subacute inpatient treatment settings such as skilled nursing facilities (SNFs), inpatient hospice care, and inpatient rehabilitation facilities.

112. When Aetna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

113. Aetna and the Plan evaluated Z.W.'s mental health claims employing medical necessity criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

114. As for Aetna's reason for discontinuing coverage that Z.W. was "medically stable," Medicare Program Integrity Manual, Chapter 6, 6.1, asserts:

> Any "rules of thumb" that would declare a [SNF] claim not covered solely on the basis of elements, including... degree of stability, is unacceptable…"[4]

Similarly, Medicare Benefit Policy Manual, chapter 8, 30.2.2.1, warns against such phrases as "[p]atient remains stable [in a SNF]" because "[s]uch phraseology does not provide a clear picture of the results of the treatment."[5]

---

[4] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c06.pdf
[5]https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/bp102c08pdf.pdf

115. Aetna boasts that it "ha[s] a robust Medicare Compliance program."[6] Upon information and belief, Aetna's guidelines for SNFs pledge compliance with Traditional Medicare regulations, as required by the 2023 New Rules for Medicare Advantage organizations (MAOs).[7]

116. The 2023 New Rules state that MAOs like Aetna "must make medical necessity determinations…in line with all fully established Traditional Medicare coverage criteria…includ[ing] established criteria in applicable Medicare statutes [and] regulations."[8]

---

[6] "Medicare Compliance FDR newsletter": https://www.aetna.com/content/dam/aetna/pdfs/aetnacom/health-care-professionals/newsletters-news/Aetna-Q2-2024-FDR-newsletter.pdf

[7] https://www.federalregister.gov/documents/2023/04/12/2023-07115/medicare-program-contract-year-2024-policy-and-technical-changes-to-the-medicare-advantage-program
Compare statement by the third-party MCG guidelines: "MCG Health is committed to following the CMS rules and regulations when developing SNF care guidelines": https://www.mcg.com/blog/2024/10/16/medicare-requirements-skilled-nursing-facilities/

[8] https://www.aha.org/system/files/media/file/2024/02/faqs-related-to-coverage-criteria-and-utilization-management-requirements-in-cms-final-rule-cms-4201-f.pdf

[9] The Plan's definition of "Residential treatment facility" (RTF) contains two final clauses that are grammatically and semantically ambiguous:

> A facility that provides mental health disorder services or substance related disorder services and meets the
> following requirements:
> - Is licensed and operated in accordance with applicable state and federal law
> - Provides treatment under the direction of an appropriately licensed physician for the level of care
>   provided
> - Maintains a written treatment plan prepared by a licensed behavioral health provider (RN or master's level) requiring full-time residence and participation
> - Has a licensed behavioral health provider, (RN or master's level) on-site 24 hours per day 7 days per week, and is:
>   - Credentialed by us, or
>   - Certified by **Medicare**, <u>or</u> [emphases added]

117. The Plan, moreover, is deferential to Medicare as it articulates an idiosyncratic definition of "Residential Treatment Facility" in which either the facility itself or its master's level behavioral health provider is expected to be "[c]ertified by Medicare."[9]

118. The Plan also states that it complies with generally accepted standards of medical practice.

119. Aetna relies on the CPT codes[10] designed by the American Medical Association (AMA), the foremost medical specialty society representative of generally accepted standards of medical practice. The AMA provides a definition of "stable" that is pertinent to Aetna's evaluation of Z.W.'s alleged stability and improvement. In the context of chronic illnesses, which includes chronic mental illnesses, i.e. illnesses lasting longer than a year, the AMA states:

> 'Stable' for the purposes of categorizing MDM [Medical Decision Making, which has implications for coding purposes] is defined by the specific treatment goals for an individual patient. **A patient who is not at his or her treatment goal is not stable**, even if the condition has not changed and there is no short-term threat to life or function.[11] [emphases added]

---

- Accredited by The Joint Commission (TJC); The Committee on Accreditation of Rehabilitation Facilities (CARF); The American Osteopathic Association's Healthcare Facilities Accreditation Program (HFAP); or The Council on Accreditation (COA)

The conjunction "or" after "Certified by Medicare" offers two interpretations: either what follows "Accredited by The Joint…" is an alternative requirement for the requirement of a licensed behavioral health provider that is credentialed by Aetna or certified by Medicare; or the Plan improperly formatted the entry for RTFs and meant to ascribe the credentialing by Aetna and Medicare certification to the RTF rather than to its master's level behavioral health provider. However one interprets these ambiguities in the Plan's definition of RTFs, the definition highlights the significance of Medicare as a yardstick for generally accepted standards of care.

[10] https://www.aetna.com/health-care-professionals/precertification/precertification-lists.html

[11] https://www.ama-assn.org/system/files/2019-06/cpt-office-prolonged-svs-code-changes.pdf

120. Z.W. was diagnosed with major depressive disorder and generalized anxiety disorder in March 2023 and manifested ongoing symptoms while in treatment at New Haven, as shown by her screaming and hitting the wall on December 17, 2024, and expressing self-harm urges on February 27, 2025.

121. When Aetna issued its denial letters, Z.W. had not met her treatment goals at New Haven in addressing such symptoms, as indicated by the medical records. Nor did Aetna ever attempt to engage with Z.W.'s treatment goals at New Haven or seek to demonstrate that she had met them before asserting that she was improving and "medically stable."

122. According to Medicare Benefit Policy Manual Chapter 6, 6.1, "Medicare contractors [SNF utilization reviewers] focus on the unique, individualized needs, characteristics and goals of each patient." Complementarily, the American Hospital Association (AHA) states in its "General Guide":

> 'Stable' should not be used as a condition. Furthermore, this term should not be used in combination with other conditions, which by definition often indicate a patient is unstable.[12]

123. Thus, by improperly imputing the term "stable" to Z.W. and failing to measure Z.W.'s stability and level of improvement against her treatment goals, Aetna violated generally accepted standards of medical practice.

124. Aetna's violation of generally accepted standards of medical practice constitutes a violation of MHPAEA because Aetna does not violate generally accepted standards of medical practice when it evaluates whether treatment in analogous levels of medical and

---

12 https://www.mahprm.org/resources/Guidelines%20for%20Releasing%20Information%20on%20the%20Condition%20of%20Patients.pdf

surgical treatment such as care at skilled nursing and rehabilitation facilities is medically necessary or otherwise covered under the terms of an ERISA plan it administers.

125. As another example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Aetna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that Z.W. received. Aetna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Aetna's denial letters such as "[Z.W.] was not acutely suicidal."

126. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the subacute level of care that Z.W. received.

127. The Plan does not require individuals receiving treatment at subacute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

128. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

129. As Jonathan pointed out in his appeal, the Medicare Benefit Policy Manual does not require patients in SNFs to exhibit acute symptoms. The Manual uses such evidentiary phrases as "when a hospital inpatient's care needs drop from acute to SNF-

level…”[13]; or “if the only reason they remain in the hospital is they are waiting for a post-acute SNF bed ...”[14]

130. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate subacute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

131. In addition, the level of care applied by Aetna failed to take into consideration the patient’s safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

132. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

133. Jonathan noted that Aetna restricted the availability of Z.W.’s treatment by forcing it to comply with requirements contained only within proprietary criteria. He argued that not only did Aetna exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for

[13] Medicare Benefit Policy, Chapter 8, 20.1: https://www.aapc.com/codes/exclusives/transmittals/internet-only-manual-updates-to-pub--100-01-100-02-and-100-04-to-correct-errors-and-omissions-snf-4705?srsltid=AfmBOoomRx3mzVKFjcx3R464K29rYd_q5939CbhDet-ExhDYOOU1iTIp
[14] Medicare Benefit Policy Manual, Chapter 1, 10.2 https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/bp102c01.pdf

analogous medical/surgical care at all. Jonathan requested to be provided with these criteria if they existed, but Aetna ignored this request.

134. Additionally, for residential treatment facilities providing mental health and substance use disorders, Aetna and the Plan fail to provide a comparable number of network residential treatment facilities compared to the number of network skilled nursing and inpatient rehabilitation facilities.

135. Evidence that Aetna's own RTC network was inadequate, even from Aetna's own admission, lies in its initial July 18, 2024, approval letter in which Aetna wrote:

> This service is approved **at an in-network benefit level.** The member will be responsible only for in-network cost-sharing requirements. **The provider** [New Haven] **identified to provide this service doesn't participate with this plan**. [emphases added]

Aetna would not have initially approved Z.W.'s residential treatment at New Haven at an in-network benefit level if its own network were adequate.

136. Indeed, Jonathan and Z.W.'s home state of Pennsylvania have among the nation's worst ratios of out-of-network use for all behavioral health clinician office visits as compared to all medical/surgical clinician office visits.[15]

137. The failure by Aetna and the Plan to provide adequate network facilities for subacute inpatient treatment of mental health and substance use disorders compared to the network facilities for subacute inpatient treatment of medical and surgical disorders resulted in a coverage disparity that violates MHPAEA.

---

[15] Page 28: *Behavioral Health Parity – Pervasive Disparities in Access to In-Network Care Continue*. Tami L. Mark, PhD, MBA; William Parish, PhD, April 17, 2024. RTI International: https://www.rti.org/publication/behavioral-health-parity-pervasive-disparities-access-network-care-continue
Also quoted by the Federal Register: https://www.federalregister.gov/d/2024-20612/p-22

138. The failure by Aetna and the Plan to provide adequate network facilities for subacute inpatient treatment of mental health and substance use disorders compared to the network facilities for subacute inpatient treatment of medical and surgical disorders resulted in Z.W. having to obtain treatment from a non-network provider.

139. Being forced to go out of network for Z.W.'s medically necessary services created a coverage disparity that violates MHPAEA because medical treatment provided by out of network providers are subject to more stringent coverage requirements and conditions than treatment provided by network providers.

140. In addition, being required to obtain treatment from out of network providers subjected Jonathan to higher cost-sharing obligations and lower benefits under the Plan than if the Plan had an adequate network of mental health providers from whom Z.W. could have received treatment. This also violates MHPAEA.

141. According to ASAM, whose authority Aetna, state and federal regulations endorse:

> Patients should not be in the circumstance of needing to access out-of-network clinicians due to an inadequacy of addiction service clinicians who are in-network. Inadequate networks and phantom networks should both be forbidden by law and regulation. Enforcement of appropriate network design should include meaningful penalties for non-compliance.[16]

142. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, standards, or other factors to limit

[16] "Third-Party Payment for Addiction Treatment," ASAM Public Policy Statement: https://www.asam.org/docs/default-source/public-policy-statements/2020-statement-on-third-party-payment-for-addiction-treatment4824349472bc604ca5b7ff000030b21a.pdf?sfvrsn=cf9854c2_2

coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

143. Aetna and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Aetna and the Plan were not in compliance with MHPAEA.

144. In fact, despite Jonathan's request that Aetna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Aetna and the Plan have not provided Jonathan with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Aetna and the Plan have not provided Jonathan with any information about the results of this analysis.

145. The violations of MHPAEA by Aetna and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

146. A declaration that the actions of the Defendants violate MHPAEA;

147. An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

148. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

149. An order requiring disgorgement of funds obtained by or retained by the Defendants due to their violations of MHPAEA;

150. An order requiring an accounting of the funds wrongly withheld, by each Defendant, from participants and beneficiaries of the Plan because of the Defendants' violations of MHPAEA;

151. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

152. An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA;

153. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA; and

154. An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

155. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

156. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' use of improper criteria for medical necessity are not available as remedies for a wrongful denial of plan benefits.

157. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a subacute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

158. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C. §(a)(1)(B).

## THIRD CAUSE OF ACTION

**(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c) Against the Plan Administrator)**

159. Aetna, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and Aetna, the medical necessity criteria for mental health and substance use disorder treatment, and the medical necessity criteria for skilled nursing and rehabilitation facilities.

160. In spite of Jonathan's requests during the appeal process for Aetna to produce the documents under which the Plan was operated, and his instructions to forward that request to the appropriate entity if Aetna was not acting on behalf of the Plan Administrator in this regard, Aetna repeatedly failed to produce to the Plaintiffs within 30 days after written request documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and Aetna, the medical necessity criteria for mental health and substance use disorder treatment, and the medical necessity criteria for skilled nursing and rehabilitation facility treatment.

161. After Aetna repeatedly failed to provide these materials, Jonathan sent one final letter dated November 21, 2025, to both Aetna and the Plan Administrator again requesting the documents which he was statutorily entitled to receive upon request. Aetna and the Plan Administrator did not comply with Jonathan's request for documents.

162. The failure of the Plan Administrator and its agent Aetna, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of Jonathan's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day on the Plan Administrator from 30 days from the date of each of these letters to the date of the production of the requested documents.

163. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Z.W.'s medically necessary treatment at New Haven under the terms of the Plan, plus pre and post-judgment interest to the date of payment;
2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;
3. For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agent Aetna's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested;
4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 26th day of June, 2026.

By s/ Brian S. King
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Montgomery County, PA